IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:19-CV-14-FL

| | |
|---|---|
| NORTH CAROLINA WILDLIFE FEDERATION and NO MID-CURRITUCK BRIDGE-CONCERNED CITIZENS AND VISITORS OPPOSED TO THE MID-CURRITUCK BRIDGE, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; EDWARD T. PARKER, in his official capacity as Assistant Division Administrator, Federal Highway Administration; and ERIC BOYETTE, in his official capacity as Secretary, North Carolina Department of Transportation, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

ORDER

This matter is before the court on the parties' cross-motions for summary judgment. (DE 88, 90, 92). The motions have been briefed fully, and in this posture the issues raised are ripe for decision. For reasons that follow, summary judgment is granted in favor of defendants.

**STATEMENT OF THE CASE**

Plaintiffs seek judicial review of defendant Federal Highway Administration's ("Highway Administration") final decision to allow defendant North Carolina Department of Transportation ("Department of Transportation") to construct a $600 million toll bridge across the Currituck

Sound near North Carolina's Outer Banks ("Mid-Currituck Bridge"). Plaintiffs are, respectively, the state's oldest and largest statewide non-profit conservation organization and a Currituck County-based membership organization aimed at opposing the construction of the instant transportation project. Plaintiffs initiated this action April 23, 2019, pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq., asserting that defendants violated the National Environmental Policy Act, 42 U.S.C. § 4331 et seq.

Plaintiffs claim that defendants' decision to construct the Mid-Currituck Bridge impermissibly rests upon an arbitrary and capricious analysis of alternatives under the National Environmental Policy Act and that they have violated the act's procedural requirements. Plaintiffs seek a declaration that defendants have violated the Administrative Procedure Act and National Environmental Policy Act, vacatur of the record of decision approving the Mid-Currituck Bridge, and an injunction preventing defendants from proceeding with the Mid-Currituck Bridge until they have complied with the relevant statutory requirements.

Defendant Highway Administration is an operating administration within the United States Department of Transportation, and defendant Edward T. Parker is an assistant division administrator for defendant Highway Administration (collectively "federal defendants"). Defendant Department of Transportation is an agency of the State of North Carolina, and defendant Eric Boyette is its Secretary (collectively "state defendants"). Defendants were involved in preparing and overseeing the completion of the statutorily required environmental impact statement and record of decision.

After filing of the administrative record by federal defendants, (see Administrative Record (DE 21-45)), pursuant to the court's case management order, plaintiffs moved to complete and supplement the administrative record. In its August 26, 2020, order, the court allowed, as

2

supplementation of the administrative record, a 1995 Alternative Study Report, a 1998 draft environmental impact statement, and certain letters sent by plaintiffs to an office of defendant Highway Administration, allowed, as extra-record evidence, correspondence from plaintiff requesting a supplemental environmental impact statement, and denied the motion in remaining part. N.C. Wildlife Fed'n v. N.C. Dep't of Transp., No. 2:19-CV-14-FL, 2020 WL 5044465, at *2-5 (E.D.N.C. Aug. 26, 2020). Thereafter, federal defendants filed the supplemented administrative record. (See Supplemented Administrative Record (DE 77-86)).[1]

The administrative record contains over 78,000 pages of documents involving the administrative decisionmaking process for the Mid-Currituck Bridge, including stakeholder technical reports; miscellaneous communications; records from the scoping process; internal drafts, comments, and revisions; a 1998 draft environmental impact statement; alternative screening reports; a 2010 draft environmental impact statement; public notice and comment on that draft environmental impact statement; various agency consultations; updated technical reports; a 2012 final environmental impact statement; public notice and comment on that final environmental impact statement; a reevaluation of the final environmental impact statement; a related reevaluation study report; and a record of decision.

In their instant motion for summary judgment, plaintiffs rely upon the completed administrative record, as well as declarations from several of their members. Subsequently, each set of defendants also moved for summary judgment, relying upon solely the administrative record. Plaintiffs filed a combined response to defendants' motions and a reply in support of their motion. Thereafter, defendants filed replies in support of their motions for summary judgment.

---

[1] Hereinafter, all references to the administrative record shall mean the administrative record as supplemented, and all citations to that administrative record shall be denoted as "R."

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows. The setting of the instant dispute is the area surrounding the Currituck Sound in northeastern North Carolina, inclusive of the Currituck County mainland, the Currituck County portion of the Outer Banks, and the Dare County parts of the Outer Banks around Kitty Hawk, as displayed below.



(R. 4686). One of the primary ways to travel to and from the Outer Banks coastal barrier islands in North Carolina is the Wright Memorial Bridge that straddles the Currituck Sound and stretches from Currituck County into Dare County. (See R. 68868, 69448, 74487-88). The most recent version of proposed Mid-Currituck Bridge project would consist of

4

construction of a 4.7-mile-long, two lane toll bridge (the Mid-Currituck Bridge) across Currituck Sound between the communities of Aydlett on the mainland and Corolla on the Outer Banks, an interchange between US 158 and the mainland approach road to the bridge, a bridge across Maple Swamp as a part of the mainland approach road, limited improvements to existing NC 12 and US 158, and primarily reversing the center turn lane on US 158 to improve hurricane clearance times.

(R. 69447). A graphical representation of the project is displayed below.



(R. 69448).

The project's genesis was in 1975, (R. 74489), but defendants' involvement began in the 1990s with defendant Highway Administration's notice of intent that "an environmental impact statement will be prepared for a Mid-Currituck Sound bridge in Currituck County, North Carolina." 60 Fed. Reg. 35255, 35255-56 (July 6, 1995); (R. 69449). Subsequently, in 1998,

defendant Highway Administration alongside defendant Department of Transportation published an initial draft environmental impact statement. (R. 74560). The project received pushback from both regulatory agencies and the community. (See R. 69961).

The 1998 draft environmental impact statement was rescinded in 2008 due to "several changes in the project including the expansion of the project study area, modification of the purpose and need statement, and analysis of additional alternatives." See 73 Fed. Reg. 31733, 31733-34 (June 3, 2008). Thereafter, notice of intent to prepare a new environmental impact statement was entered. 73 Fed. Reg. 34065, 34065-66 (June 16, 2008).

A. Preliminary Processes, Drafting, and Scoping

A draft "statement of purpose and need" was published in April 2008 and finalized in October 2008. (R. 3073, 4588).[2] The finalized statement laid out the need for the Mid-Currituck Bridge as follows:

1) The need to substantially improve traffic flow on the . . . throughfares (US 158 and NC 12 [on the Currituck County peninsula on the mainland and its Outer Banks, as well as the Dare County Outer Banks north of Kitty Hawk].

2) The need to substantially reduce travel time for persons traveling between the Currituck County mainland and the Currituck County Outer Banks.

3) The need to substantially reduce evacuation times from the Outer Banks for residents and visitors who use US 158 and NC 168 as an evacuation route.

(R. 4596). These needs were predicated by "[t]he project area's main thoroughfares (US 158 and NC 12) . . . becoming increasingly congested," with "congestion . . . becom[ing] even more severe in the future"; "[i]ncreasing congestion . . . causing travel time between the Currituck County mainland and the Currituck County Outer Banks to increase, especially during the summer[]"; and

---

[2] At this point in the project's life, the state agency involved in planning was the North Carolina Turnpike Authority, which, as of 2009, is now located within defendant Department of Transportation, see Act of July 27, 2009, S.L. 2009-343, § 1, 2009 N.C. Sess. Laws 585, 585-86, and is treated as synonymous with defendant Department of Transportation for the purposes of this order.

6

"[e]vacuation times for residents and visitors who use US 158 and NC 168 as an evacuation route far exceed[ing] the State-designated standard of 18 hours." (R. 4595-96). The statement further explained that various courses of actions would be considered based on their ability to meet the three needs highlighted above through substantial improvements. (R. 4597). The document explains that "an improvement is considered substantial as opposed to minor if the improvement is great enough to be largely noticeable to typical users . . . and if the improvement offers some benefit across much of the network as opposed to a few offering only localized benefits." (Id.).

B.    Alternatives Screening

In accordance with the foregoing statement of purpose and need, in October 2009, defendants prepared an "Alternatives Screening Report," which examined what alternatives in addition to the proposed action would be selected for more detailed study in a draft environmental impact statement. (R. 9374). The Alternatives Screening Report discussed a "No-Build Alternative," various improvements to the existing roads, several potential iterations of the Mid-Currituck Bridge (varying in positioning and design), various ferry options, and "[s]everal low capital investment and operational alternatives," including, specifically, "shifting rental times" and various forms of public transit. (R. 9375-440). It also considered combinations of iterations of the Mid-Currituck Bridge and improvements to existing roads. (R. 9395). It concluded that the three alternatives would be studied in further detail, as follows.

First, the "ER2" alternative, the second improving existing roads option, would be further studied. This alternative consisted of "[a]dding a third outbound lane on US 158 between NC 168 and the Wright Memorial bridge as a hurricane evacuation improvement or using the center turn lane as a third outbound evacuation lane"; "[w]idening US 158 to eight lanes between the Wright Memorial Bridge and the NC 12 intersection"; and "widening NC 12 to three lanes between US

7

158 and the Dare-Currituck County Line and to four lanes between the Dare-Currituck County Line and Corolla." (R. 9440-42).

Second, the "MCB2" alternative would be studied in further detail. This option consisted of "[c]onstructing a two-lane toll bridge across the Currituck Sound in Currituck County"; "[a]dding a third outbound lane on US 158 between NC 168 and Aydlett Road (SR 1140) as a hurricane evacuation improvement or using the center turn lane as a third outbound evacuation lane"; "[w]idening US 158 to six lanes between the Wright Memorial Bridge and Jupiter Trial/Walmart entrance and eight lanes from Jupiter Trail/Walmart entrance to the NC 12 area"; and "[w]idening NC 12 to three lanes between US 158 and the Dare-Currituck County Line and to four lanes between the Dare-Currituck County Line and Corolla." (R. 9442).

Finally, the "MCB4" alternative was slated for further review. It involved "[c]onstructing a two-lane toll bridge across the Currituck Sound in Currituck County"; "[a]dding a third outbound lane on US 158 between NC 168 and Aydlett Road (SR 1140) as a hurricane evacuation improvement or using the center turn lane as a third outbound evacuation lane"; "[a]dding a third outbound lane on US 158 between the Wright Memorial Bridge and NC 12"; and "[w]idening NC 12 to four lanes for approximately two to four miles south of the intersection with a Mid-Currituck Sound Bridge." (Id.).

The Alternatives Screening Report concluded that the remaining alternatives would not receive further detailed study. As pertinent here, it rejected further study of an alternative involving shifting rental times for the "substantial number of vacation rental properties" in the area from falling primarily on Saturdays to "even distribution among Friday, Saturday, and Sunday." (R. 9411-12). This was because no relevant agency had the "authority to compel implementation" of a shift in rental times. (R. 9412). Further, it concluded that although this alternative would

8

"result in some reduction in congestion on NC 12 and US 158 during summer weekends," the reduction in total congestion would only be 1% and "would not provide any reduction in hurricane clearance time." (R. 9413). Accordingly, it concluded that "this alternative would not meet the project's purpose and need." (Id.).

Similarly, options involving "bus transit," "maximiz[ing] the efficiency of the existing transportation without a major capital investment" (e.g., "optimizing signal timing on US 158 and NC 12"), and "ferry alternatives" were all considered and rejected. (R. 9413-23). Each was rejected for, inter alia, only providing, at best, a minimum to moderate improvement in limited areas of identified need or, at worst, failing to provide any substantial improvement or resulting in substantial cost and environmental impacts. (See id.).

In the wake of this Alternatives Screening Report, defendant Department of Transportation had an assessment of indirect and cumulative effects report prepared that considered the impact of "[t]he proposed project and its detailed study alternatives"; "[p]rivate development and the provision of infrastructure to serve that development"; "[o]ther transportation projects presented in the 2009 to 2015 State Transportation Improvement Program (STIP) and included in the No-Build Alternative"; and "[l]ogging in forested areas, including wetlands." (R. 12400). Specifically, the assessment considered the proposed project and its detailed study alternatives' potential to 1) "increase . . . permanent residents on the Outer Banks"; 2) "increase . . . the number of day trips to the Outer Banks"; 3) alter "development in the paved NC 12-accessible Outer Banks . . . in terms of future development location, rate, [and] type"; 4) the same in terms of development in the "non-paved-road accessible area north of the terminus of NC 12"; and 5) the same in terms of development "in mainland Currituck County." (R. 12400-01). These conclusions and

9

considerations were incorporated into the draft and final environmental impact statements described below.

C.    2010 Draft Environmental Impact Statement

In March 2010, defendants promulgated a draft environmental impact statement together with public notice seeking comments on the draft and the proposed project. (R. 14693-94, 14700, 69450). The draft environmental impact statement laid out the three alternatives selected for detailed study (that is, the ER2, MCB2, and MCB4 alternatives) and the no-build alternative. (R. 14703-04). It further divided the two bridge alternatives into variants with different termini for the bridge corridor on the Outer Banks, described as "C1," which connected "with NC 12 at an intersection . . . north of the Albacore Street retail area," and as "C2," which connected "with NC 12 . . . south of this area." (R. 14703). It also explicated the following design options for the mainland approach to the potential Mid-Currituck Bridge: Option A, which would "place a toll plaza within the US 158 interchange" and include "a bridge over Maple swamp"; and Option B, which would "not include the toll plaza" and would place a road on fill within Maple Swamp. (R. 14745). It identified the MCB4 alternative as the recommended alternative, with no recommendation as to the bridge corridor alternatives or mainland approach design options. (R. 14719-20).

Three public hearings were held in May 2010 and comments were received from the public and numerous agencies. (R. 36030-34). Additionally, another indirect and cumulative effects assessment was prepared in November 2011. (R. 35584). It, unlike the prior assessment, considered the now-preferred, not just recommended, alternative of MCB4 with a C1 bridge corridor and an Option A mainland approach design. (R. 35601). Further, the assessment now factored in "[b]each driving" and "[a]ccelerated sea level rise" and considered the following

10

potential activities related to the proposed project and its alternatives: "[m]odification of regime" (e.g., "[a]lteration of habitat" and "drainage"); "[l]and transformation and construction"; "[r]esources extraction"; "[l]and alteration"; "[c]hanges in traffic"; and "[a]ccess alteration." (R. 35604-05, 35678). Its analysis and conclusions were factored into the final environmental impact statement described below. (R. 36001-24).

D.     2012 Final Environmental Impact Statement

In light of the comments received, defendants issued a final environmental impact statement in January 2012, again seeking comment from the public and other agencies. (R. 35799, 35806-07). It analyzed the no-build alternative, the ER2 alternative (the previously described improved existing roads alternative), and four iterations of the Mid-Currituck Bridge, including the MCB2/C1 and C2 and MCB4/C1 and C2 alternatives. (R. 35808-11). It highlighted the relevant determinative factors in selecting an alternative as: "[e]ffectiveness in meeting the project's purpose and need"; "[c]ost and affordability"; "[t]he ability to meet a variety of state and federal regulatory requirements"; and "[m]inimizing impacts to communities, cultural resources, and natural resources." (R. 35814).

The final environmental impact statement analyzed each of the alternatives in light of the foregoing factors and concluded that the following refinement of one the alternatives was the preferred alternative: "MCB4/C1 with Option A" refined with "[p]rovision of a median acceleration lane at Waterlily Road"; only 2.1 miles of "four-lane widening along NC 12 . . . plus left turn lanes at two additional locations"; construction of "roundabouts on NC 12 instead of signalized intersections at the widened sections"; termination of the bridge in a roundabout at NC 12; "provision of marked pedestrian crossings along NC 12 where it would be widened"; and "reversing the center turn lane on US 158 between the US 158/Mid-Currituck Bridge interchange

and NC 168" on the mainland for hurricane evacuation, as well as "adding 1,600 feet of new third outbound lane to the west of the NC 12/US 158 intersection" on the Outer Banks. (R. 35807, 35810-11, 35862).

In applying the first factor (effectiveness in meeting the project's purpose and need), the final environmental impact statement concluded that the "MCB2 [alternative] . . . would have the greatest traffic flow benefits and [the] ER2 [alternative] would have the least." (R. 35887). It explained that the MCB2 alternative would reduce congested travel in 2035 in the area by 52% as opposed to the preferred alternative's 39% and the ER2 alternative's 22%. (R. 35815, 35888). Further, the document described defendants' conclusion that all of the bridge options (the MCB2 and MCB4 alternatives and the preferred alternative) "would offer substantial travel time savings" for those traveling between the Outer Banks and the Currituck County mainland. Again, the MCB2 alternative offered the most travel time savings, followed by the MCB4 alternative and the preferred alternative, with the ER2 alternative providing the least.

As to the hurricane evacuation concerns undergirding the project, the final environmental impact statement described that construction of a third outbound lane on US 158 had the greatest reduction in hurricane evacuation clearance time while reversing the center turn lane would also substantially reduce the time, though not as much as constructing a third outbound lane. The third outbound lane "could be achieved with any of the detailed study alternatives" but "[r]eversing the center turn lane would be practical only with" the bridge alternatives. (R. 35815, 35887-88).

Turning to a cost and payment plan for each option, based on defendants' findings, the ER2 alternative would be the least costly option with the preferred alternative being "the least expensive bridge alternative." (R. 35889). However, defendants concluded that the bridge options had more funding sources since they could rely on "state appropriations from highway user taxes and toll

revenues" in addition to use of a "Public Private Partnership," meaning a "formal collaboration[] between public agencies and private concessionaires." (R. 35889-93). Specifically, the bridge options allowed for access to certain state gap-funding that would not be available for construction of the ER2 alternative, which would rely solely on "traditional highway financing methods." (R. 35892).

In considering the final two factors, the final environmental impact statement analyzed a wide range of environmental impacts "including direct impacts to the community, cultural resources, natural resources, other physical characteristics (noise, air quality, energy use, accelerated sea level rise, visual quality, hazardous materials and underground storage tanks, and floodplains), as well as construction impacts and indirect and cumulative effects." (R. 35821). The outcome-determinative, and therefore pertinent, considerations in choosing the preferred alternative were described as follows. Although the ER2 alternative would have "minor" "[n]eighborhood and community cohesion impacts", as opposed to the preferred alternative's "creation of a visual barrier in Aydlett," the preferred alternative's reduction of the "amount of NC 12 four-lane widening" addressed citizen and local government concerns and reduced the potential for community impacts along NC 12 generally. (R. 35898). The preferred alternative had little or no impact on cultural resources. (See R. 35923-30).

As to natural resource impacts, although the preferred alternative would increase impervious surface area more than the ER2 alternative, assuming the latter did not include a third outbound lane for hurricane evacuation, it would result in less wetland fill impacts and the least fill in natural upland communities. (See R. 35898, 35939-41). Further, the preferred alternative included revisions from the MCB2 and MCB4 alternatives that minimized construction-related impacts to the Currituck Sound and bridge runoff. Of the alternatives, the "ER2 [alternative]

would be the least invasive to [wildlife and vegetative] habitat followed by the [p]referred [a]lernative." (R. 35946). The final environmental impact statement declared that the preferred alternative "would have the least number of homes that would experience an adverse noise effect" and "would reduce the impact of accelerated sea level rise on travel on the Outer Banks north of the Dare/Currituck County line." (R. 35899). Finally, in analyzing the ability to meet a variety of state and federal regulatory requirements, the document described defendants' conclusion that the preferred alternative would either not have an impact that would affect the considered regulatory requirement or that the relevant regulatory requirement could be met. (R. 35817-21, 35954-36000).

In sum, the final environmental impact statement explains that defendants selected the preferred alternative as such because it had substantial traffic flow and travel time benefits, compared to the ER2 alternative, which had the least, and because it would result in some reduction in hurricane evacuation clearance time. (R. 35887-88). Further, the preferred alternative, while more expensive, was economically feasible due to the availability of certain funding sources as compared to the ER2 alternative, which "[w]ithout substantial unencumbered funds" would not be able to be constructed. (R. 35892, 35899). And the preferred alternative's hurricane evacuation improvements would result in less work on US 158, meaning a reduction in cost and environmental impacts. (R. 35899).

Defendants sought further comments on the final environmental impact statement before issuance of a record of decision. (R. 35806).

E.     Intervening Period, Reevaluation, and 2019 Record of Decision

The final environmental impact statement in 2012 was not followed soon thereafter by the anticipated record of decision culminating the decisionmaking process on the project, however.

14

(R. 68952). Rather, the process was delayed, (R. 68952), because, in 2013, the North Carolina General Assembly withdrew one of the funding resources that the final environmental impact statement identified as a potential source for the project. See Act of June 26, 2013, SL 2013-183, § 4.8, 2013 N.C. Sess. Laws 470, 493; (see also R. 68807). New plans of finance were prepared. (See R. 70372, 75482; see also R. 68807-08).

More than three years passed from the final environmental impact statement without any major steps being taken to advance the action. (R. 68792). Accordingly, as required by defendant Highway Administration's regulations, see 23 C.F.R. § 771.129(d), defendants began the process of reevaluating the 2012 environmental impact statement. (See, e.g., R. 69513). This culminated in, on March 6, 2019, a reevaluation of the final environmental impact statement and accompanying study report ("reevaluation documents"). (R. 68784, 69480). These reevaluation documents incorporated the comments received on the final environmental impact statement into their analysis and conclusions. (R. 69010-150, 69492).

The reevaluation documents concluded that there were no new, relevant significant environmental impacts or issues of significance associated with the project. (R. 69489, 69492). The documents considered changes in traffic forecasts, travel times, and hurricane evacuation predictions, such as traffic forecasts for 2040 being lower than the previously used forecasts for 2035, as well as the slowing of various growth trends in the area. (R. 68838-69). One other notable change was the impact that "application of development constraints," meaning the "potential constraints on development on the Outer Banks north of US 158 resulting from NC 12 having insufficient capacity to serve traffic generated by planned and expected development," had on "the congestion and hurricane clearance assessment." (R. 68832, 68836).

15

These, and changes in the setting of the project (e.g., the construction of "multi-use paths along NC 12" by Currituck County), led defendants to revise the no-build alternative, the ER2 alternative, and the preferred MCB4/C1 with Option A alternative. (R. 68794-804). The revised ER2 alternative now involved "fewer proposed improvements on NC 12," a "revised intersection instead of an interchange at the intersection of US 158 and NC 12," and "a third outbound evacuation lane on US 158" used only for evacuation use. (R. 68804). The revised MCB4/C1 with Option A alternative would now have a "revised interchange between US 158 and the mainland approach road" that "eliminate[d] the need for a median acceleration lane" and would no longer have most of the previously noted improvements "to NC 12 south of . . . the Outer Banks bridge terminus." (R. 68800).

Despite updates to the relevant data and forecasts, the ER2 alternative and the preferred alternative were still predicted to provide "notable travel time reductions . . . with the [p]referred [a]lternative continuing to offer the greater benefit." (R. 68867). However, with the consideration of constrained development, the preferred alternative no longer resulted in the same significant reduction in congested vehicle miles traveled, a measure of traffic congestion. (R. 68866). Yet, the preferred alternative still continued to be predicted to provide the "greatest [travel] benefits . . . on the summer weekend" and other "greater benefits than the [n]o-[b]uild [a]lternative or [the] ER2 alternative," while the ER2 alternative failed to "address congestion on NC 12." (R. 68866-67). The ER2 alternative now also had a lower hurricane clearance time than the preferred alternative, assuming constrained development. (Compare R. 68868, with R. 34954). Finally, although the funding situation had changed, there would still not be "available funding . . . adequate to construct [the] ER2" alternative. (R. 68808). On the other hand, toll revenue, in large part, made financing the preferred alternative feasible. (See R. 68808).

16

The reevaluation documents also concluded that the changes in the updated traffic forecast did not change the initial decision on what alternatives merited detailed study, that is, alternatives such as transportation systems management and shifting rental times were still considered unreasonable alternatives. (<u>See</u> R. 68870-72). The same was true for the newly examined "composite alternative" that analyzed a "combination of ER2 road improvements, shifting rental times evenly over the summer week, bus transit, and a ferry," which "would result in additional travel benefits over any single alternative, but the difference would be small." (R. 68882).

The same day that the reevaluation documents were issued, the federal defendants, in conjunction with the state defendants, issued the record of decision adopting the preferred alternative, in large part as laid out in the final environmental impact statement and as redefined in the reevaluation documents, as the proposed action for the project. (R. 69479).

Additional facts pertinent to the instant motions will be discussed below.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court "consider[s] each motion separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." <u>Defs. of Wildlife v. N.C. Dep't of Transp.</u>, 762 F.3d 374, 392 (4th Cir. 2014).[3] The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

---

[3]    Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."  Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982).  Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir.

2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489-90.

B.     Analysis

1.     The Administrative Procedure Act

The Administrative Procedure Act "governs [the court's] review of agency actions under [the National Environmental Policy Act]."  Defs. of Wildlife, 762 F.3d at 393; Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 189 (4th Cir. 2009).  Accordingly, "a reviewing court . . . [may] set aside an agency action if the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596, 601 (4th Cir. 2012).

"This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'"  Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  "[S]o long as the agency provides an explanation of its decision that includes a rational connection between the facts found and the choice made, its decision should be sustained."  Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs, 991 F.3d 577, 583 (4th Cir. 2021); N.C. Wildlife Fed'n, 677 F.3d at 601 ("A reviewing court must ensure that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[.]'" (first and second alterations in original) (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009))).  At base, the standard is "highly deferential, with the presumption in favor of finding the agency action valid," especially, "[w]hen an agency is called upon to make complex predictions within its area of special expertise."  Ohio Valley, 556 F.3d at 192; see also Marsh, 490 U.S. at 378 ("When specialists express conflicting views, an

agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

2.    The National Environmental Policy Act

The National Environmental Policy Act mandates "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences, . . . and that provide for broad dissemination of relevant environmental information." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). "What constitutes a 'hard look' cannot be outlined with rule-like precision. "At the least, however, it encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 185 (4th Cir. 2005).

The heart of the act is the requirement that for every major federal action significantly affecting the quality of the human environment, the agency involved must prepare an environmental impact statement "that discloses and evaluates, among other things, the environmental impact of the proposed action, unavoidable adverse effects of the proposed action, and alternatives to the proposed action." Defs. of Wildlife, 762 F.3d at 393-94; 42 U.S.C. § 4332(C).    The act requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2019).[4]  The environmental impact statement must, in "present[ing] the environmental impacts of the proposal and the alternatives in comparative form[,] . . . [i]nclude the alternative of no action." Id. § 1502.14(d). The agency must

---

[4]        The cited 2019 regulations were amended by Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020).  The 2020 amended regulations explain that they "apply to any [National Environmental Policy Act] process begun after September 14, 2020." 40 C.F.R. § 1506.13.  Accordingly, because the instant National Environmental Policy Act process began before September 14, 2020, the court applies the regulations then in force, that is, those codified in the 2019 edition of the Code of Federal Regulations.  Hereinafter, citations to "C.F.R." are a reference to that edition of the regulations.

weigh and consider the direct, indirect, and cumulative effects of the proposed action. Id. §§ 1508.7, .8.

"[A] court reviewing an [environmental impact statement] for [National Environmental Policy Act] compliance must take a holistic view of what the agency has done to assess environmental impact. Courts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon Soc'y, 422 F.3d at 186. "If the agency has followed the proper procedures, and if there is a rational basis for its decision, [the court] will not disturb its judgment." Hodges v. Abraham, 300 F.3d 432, 445 (4th Cir. 2002); see also Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-28 (1980) ("[O]nce an agency has made a decision subject to [the National Environmental Policy Act's] procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken."). The act "does not mandate particular substantive results, but 'merely prohibits uninformed—rather than unwise—agency action.'" N.C. Wildlife Fed'n, 677 F.3d at 601 (quoting Robertson, 490 U.S. at 350); Nat'l Audubon Soc'y, 422 F.3d at 199 ("Courts should not second-guess agency decisions, so long as the agency has given a hard look at the environmental impacts of its proposed action.").

3.    Analysis of Grounds for Summary Judgment

Plaintiffs raise several independent grounds challenging defendants' final decision under review. They challenge the 2012 final environmental impact statement, upon which the 2019 record of decision relies, for its alleged failure to use an accurate no-action baseline and for its analysis of the alternatives to a Mid-Currituck Bridge, both of which plaintiffs contend makes record of decision arbitrary and capricious in its reliance on the 2012 final environmental impact

statement. Plaintiffs also challenge defendant's failure to issue a supplemental environmental impact statement after the 2012 final environmental impact statement, prior to issuing record of decision in 2019, asserting that such decision was arbitrary and capricious. On the other hand, defendants oppose each proposition and assert that their actions were neither arbitrary nor capricious and therefore must be upheld. The court addresses each of plaintiffs' grounds for challenging defendants' decision in turn below.

a.    No-Build Baseline/No-Action Alternative

Plaintiffs assert that defendants' portrayal of the no-action alternative, which serves as a baseline for the impact that will be caused by the studied alternatives, see N.C. Wildlife Fed'n, 677 F.3d at 603, impermissibly presumed that the Mid-Currituck Bridge would be built.

"[A]gencies violate [the National Environmental Policy Act] when they fail to disclose that their analysis contains incomplete information." Id.; 40 C.F.R. § 1502.22 (explaining that an agency "shall always make clear" if there is "incomplete or unavailable information" in an environmental impact statement). Accordingly, where an agency's statutorily required no-build baseline is "miscalculate[d]" or "assumes existence of the proposed project," the reviewing court permissibly finds that the National Environmental Policy Act has been violated. N.C. Wildlife Fed'n, 677 F.3d at 603; Friends of Back Bay v. U.S. Army Corps of Eng'rs, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision.").

Here, the final no-action alternative is described in the 2019 record of decision by reference to the contemporaneous reevaluation study report, (R. 69457), which, in turn, redefines the no-action alternative as laid out the 2012 final environmental impact statement, (R. 68580-83), and updates the information relied upon in the 2009 alternatives screening report and 2011 indirect and cumulative effects technical report, (see, e.g., R. 68655-56, 68720). The 2012 final environmental

impact statement incorporates by reference the detailed analysis of the 2011 technical report, (R. 35067), and findings of the analysis in the 2009 report. (R. 35087). Both of those documents rely on forecasts of traffic patterns in 2035 as penned in a 2008 report. (R. 12407, 35699).

The 2008 traffic forecast report explained that it examined a scenario that "assumes that no Mid-Currituck Bridge is constructed" and lays out estimates of, inter alia, daily traffic volumes without a Mid-Currituck Bridge and with a Mid-Currituck Bridge. (R. 5442-46). This forecast assumes "full build out of the NC 12-accessible area and a continuation of recent build trends" collectively representing 86% build-out from the Southern Shores area to the Virginia border. (R. 35699). However, the 2011 technical report explained that, if the no-build alternative was taken, "traffic congestion on NC 12 could be great enough to constrain development in the Outer Banks, such that it could cause a practical limit" on the number of homes or hotels in the project area close to a "practical build-out at approximately [70%] of the maximum build-out." (Id.).

The 2012 final environmental impact statement acknowledged this possibility. It first laid out defendants' conclusion that "[f]or the NC 12-accessible Outer Banks, there would be no reasonably foreseeable change in the overall type and density of development" if any of the build options were taken over the no-build alternative. (R. 35074 (emphasis added)). It further explained that "[n]egligble or no increase in demand for houses and businesses throughout the Outer Banks resort area would be foreseeable over the [n]o-[b]uild [a]lternative." (Id.). However, it then acknowledged that "[a] potential for a differential in realized development could occur if traffic congestion becomes a constraint" and that such a constraint would result in 2,400 less homes or hotel rooms being built. (R. 35074-75). Ultimately, the 2012 statement found that the bridge alternatives would induce: 1) a change in the order on development of available lots on the Outer Banks, 2) 68 more acres of business development near the potential US 158/Mid-Currituck Bridge

Interchange, and 3) a potential increase in day visitors in the NC 12 area and unregulated beach-driving areas. (R. 35081; see also R. 35075 (concluding that the potential constraint would not result in a "proportionate reduction in new paved roadways because much of the reduction would occur in the non-road area and even the reductions that would be in the NC 12 area are largely serviced by roads that would otherwise exist")). As analyzed in the final environmental impact statement, these impacts either as indirect or cumulative effects would be minimal or low in reference to environmental impacts ranging from water quality to the wild horse habitats on the northern Outer Banks. (R. 35082-81, 35085-86).

Although the 2012 environmental statement does, as plaintiffs contend, frame the no-build alternative as causing an indirect change (in the form of a reduction of growth), (see R. 35081), it does not violate the National Environmental Policy Act. The court owes some degree of deference to defendants in framing the no-action alternative. See North Carolina v. FAA, 957 F.2d 1125, 1135 (4th Cir. 1992); see also Friends of Yosemite Valley v. Kempthorne, 520 F.3d 1024, 1038 (9th Cir. 2008). And defendants explained their rationale that the growth trend expected in area land-use plans, which assumed that most land suitable for development would be developed, would not be substantially impacted by the alternatives discussed. (R. 35085; see also R. 35630-34, 35697-98, 68824). Cf. N.C. Wildlife Fed'n, 677 F.3d at 603 n.2 ("The case at hand is markedly different. The record here is devoid of any evidence establishing that the region is developmentally saturated such that a major toll road will have no appreciable environmental impact."). This conclusion is joined by the congruous conclusion that transportation improvements in the area would "still have an influence on development" in the form the "location of development, i.e., which land will develop first." (R. 35698).

Defendants have "disclos[ed] the data's underlying assumptions" and "respond[ed] to public concerns" about those assumptions. See N.C. Wildlife Fed'n, 677 F.3d at 605. Accordingly, they have taken the required "'hard look' at environmental consequences" of a proposed action by contrasting it to the no-action alternative, as required by the National Environmental Policy Act. See id. The court is not faced with a situation where it is "unable to divorce the [agency's] demonstrably incorrect assumption . . . from its ultimate conclusion," and the no-build baseline allows for comparative analysis as contrasted with the other alternatives. See Friends of Back Bay, 681 F.3d at 589. Therefore, the court is not required to "invalidate the resultant [final agency action] as arbitrary and capricious." See id. The informed decisionmaking process that the act requires has been engaged in, and the court's review does not extend to whether it would make the same conclusion as the agency-defendants.

As to the record of decision's reliance on a no-action base line similar to that used in the 2012 final environmental impact statement, this also does not make the defendants' final decision an arbitrary or capricious one, to the extent plaintiffs challenge such. (See Pls. Resp. & Reply (DE 95) at 27-28). In their reevaluation, defendants concluded that new data indicated that the possible "constraints on development on the Outer Banks north of US 158 resulting from NC 12 having insufficient capacity to serve traffic generated by planned and expected development," (see R. 68832, 68836), "is about 200 units more than what was presented in the [final environmental statement] . . . , increasing the amount of land that would remain undeveloped by approximately 60 acres." (R. 68942). The changes to the constraint analysis between the 2012 final environmental impact statement, and the 2019 reevaluation only "had a nominal impact o[n] the [former's] findings because most of the lots" impacted were "already almost entirely developed." (R. 68942). The constrained development scenario did have an impact on "the congestion and hurricane

25

clearance assessment," (R. 68832, 68836), as was explicitly laid out in the reevaluation study report.

The reliance on the no-build baseline as a comparative alternative, in both constrained and unconstrained development format, does not impermissibly obscure the logical path from that comparison to the ultimate decision by defendants and indicates that defendants considered the relevant factors. (See, e.g., R. 68824). See generally Aracoma Coal Co., 556 F.3d at 192. The court is not able to say that the no-build alternative used in making the record of decision makes that decision an arbitrary and capricious one. Nor, for the reasons already noted, does it leave the court "unable to divorce" any purported "demonstrably incorrect assumption . . . from [defendants'] ultimate conclusion," as would be violative of the National Environmental Policy Act. See Friends of Back Bay, 681 F.3d at 589.

Plaintiffs argue that defendants may not rely on the land-use plans in developing the no-action alternative because those plans assume the construction of the Mid-Currituck Bridge and that defendants falsely represented to the public that the alternatives had no development impacts.

Defendants looked to land use plans in drafting and finalizing the environmental impact statements, in part, based on regulatory guidance. See 23 C.F.R. pt. 450, app. A. (explaining that "[l]ocal land use, growth management, or development plans" are the "types of planning products [that] provide analysis of the affected environment and environmental consequences that are useful in a project-level NEPA analysis"). Some of those same land use plans predict construction of a Mid-Currituck Bridge. (R. 34980-81). However, the future development planned in those land use plans is not contingent on the building of the project and will proceed, under those plans, absent building of a Mid-Currituck Bridge. (See R. 68824). Accordingly, use of those land use plans did not result in a "material misapprehension of the baseline conditions," Friends of Back Bay, 681

26

F.3d at 588, and did not result in defendants "mischaracteriz[ing]" any data, especially given the repeated statements by defendants as to the assumptions underlying that data. See N.C. Wildlife Fed'n, 677 F.3d at 603.

Next, defendants throughout the process, such as in the final environmental impact statement and the 2011 technical report, openly revealed that any bridge project might have an influence on development in the area, and delineated that influence region by region. (See, e.g., R. 35071-77, 35697-98, 35700-01, 35704, 35707). Taking a "holistic view of what [defendants] ha[ve] done to assess environmental impact," they have satisfied the procedural requirements of the National Environmental Policy Act in this regard. See Nat'l Audubon Soc'y, 422 F.3d at 186.

       b.    2012 Final Environmental Impact Statement

In reference to the 2012 final environmental impact statement, plaintiffs assert that defendants "failed [to] evaluate a full range of reasonable alternatives, consider a combination of alternatives, and objectively present alternatives in comparative form." (Pl.'s Mem. (DE 89) at 37).

"An agency has substantial discretion in its evaluation of alternatives." North Carolina, 957 F.2d at 1135; see City of Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) (explaining that a reviewing court considers "whether a particular alternative is reasonable in light of" the enumerated project objectives "with considerable deference to the agency's expertise and policy-making role"). Agencies are not statutorily required to analyze every possible alternative to the putative action, and their analysis is permissibly "bounded by some notion of feasibility." See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 551 (1978). Accordingly, "[f]or alternatives that are unreasonable," such as "those that do not accomplish the purpose or objective of the action," "the agency need only briefly discuss its reasons for

27

eliminating them from detailed study." Webster v. U.S. Dep't of Agric., 685 F.3d 411, 427 (4th Cir. 2012).

### 1. Elimination of Staggered Rental Check-Ins

Plaintiffs assert that defendants arbitrarily eliminated staggered rental check-in times as an alternative to the Mid-Currituck Bridge. However, defendants eliminated this option from consideration for more detailed study because, inter alia, they have "no authority to compel implementation of the Shift Rental Times Alternative," meaning they considered its implementation unfeasible. (R. 9412).[5] The 2012 environmental impact statement made specific reference to the 2009 alternatives screening report, (R. 34879), which explained such, and further reiterated that as an alternative it was not "found to make more than a minimal reduction in congestion and travel time," (R. 34962), not to mention that it provided no hurricane evacuation benefit, (R. 9412). Ergo, it failed to accomplish any of the three purposes of the project. Defendants did not act arbitrarily in eliminating shifting rental times as an unreasonable alternative.

Plaintiffs argue that defendants purposefully diluted the impact of this alternative by averaging its impact out across all days rather than just those days with high traffic demands in the area. (Pls.' Mem. (DE 89) at 39). Contrary to plaintiffs' assertion, defendants specifically considered the impact of this alternative in regard to its impact on the miles of road congested on summer weekends. (R. 9412; see also R. 5285). Plaintiffs further argue that it was arbitrary of defendants to only consider shifting rental times to "an even distribution amongst Friday, Saturday,

---

[5]     Neither Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800 (9th Cir. 1999), nor Natural Resources Defense Council, Inc., v. Morton, 458 F.2d 827 (D.C. Cir. 1972), imagine the situation at issue here in their discussion of extra-jurisdictional solutions that agencies must consider under the National Environmental Policy Act. See Muckleshoot, 177 F.3d at 814 (considering an agency's assertion that it could not appropriate funds, although it could, by its own admission, request those funds); Nat. Res. Def. Council, 458 F.2d at 835 (considering a proposed action that was "an integral part of a coordinated plan to deal with a broad[, national,] problem").

28

and Sunday," (id.), rather than into the weekdays (Pls.' Mem. (DE 89) at 39). However, defendants explained that the alternative was framed as such because that is when market demand existed to check-in and out. (R. 68871-72). Finally, a week-long distribution of staggered rental times, in combination with other alternatives, was considered as part of the reevaluation of the final environmental impact statement prior to the record of decision but was still considered less effective than other options. (R. 68871); see also Hickory Neighborhood Def. League v. Skinner, 910 F.2d 159, 164 (4th Cir. 1990) ("Because these alternatives would not fulfill the transportation needs of the project, the [agency] properly rejected them as imprudent."). The court cannot conclude that this is unreasonable or that defendants failed to meet their obligation to provide a brief discussion for the reason this alternative was eliminated from further study.

2.     Combination

Plaintiffs further contend that defendants' analysis of alternatives should have included an alternative composed of a combination of alternatives, including ferries, public transit, minor road improvements, and shifting rental times.

As an initial matter, defendants did, in fact, consider the efficacy of an alternative that combined implementation of a ferry and improvement to existing roads. (R. 9416-19). The ferry alternatives even combined with road improvements were considered unreasonable because of the dredging of the Currituck Sound that would be required, the initial capital costs, and the operating costs. (R. 9419-20). Nor would a ferry service, even with road improvements, "notably reduce congestion or travel times," two of the primary purposes of the project. (R. 34962). Further, prior to entry of the record of decision, defendants did consider a "composite alternative" as part of their reevaluation of the final environmental impact statement. (R. 68882). However, even combined, the various alternatives did not provide more substantial traffic flow benefits than the alternatives

29

selected for detailed study and would involve the costs of all those alternatives combined. (R. 68848-49, 68871, 68882).

Plaintiffs contend that under the United States Court of Appeals for Tenth Circuit's decision in Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002), defendants' purported failure to explore more rigorously an option cumulating multiple alternatives makes their rejection of those alternatives arbitrary and capricious. See id. at 1121-22 ("[N]o effort was made to consider [Transportation System Management] and mass transit together and/or in conjunction with alternative road expansion as a means of meeting Project goals. This represents one of the most egregious shortfalls of the [environmental assessment]."). However, as later Tenth Circuit decisions have explained, Davis considered the "agency's [National Environmental Policy Act] analysis . . . deficient because it 'summarily rejected' alternatives that could not, 'standing alone,' achieve the project's goals." Audubon Soc'y of Greater Denver v. U.S. Army Corps of Eng'rs, 908 F.3d 593, 604 (10th Cir. 2018) (emphasis added) (quoting Davis, 302 F.3d at 1122). Davis stands in stark contrast to situations where the agency's "analysis . . . is far more extensive" and its "discussion sufficiently explain[s] why the [agency] did not consider [an alternative] to be a reasonable alternative worthy of further analysis." Id. Davis is inapplicable where, as here, defendants sufficiently explain why the individual alternatives are "remote, speculative, impractical[,] or ineffective." See 302 F.3d at 1121-22.

### 3. Inconsistent Rationalization

Plaintiffs assert that defendants' comparison of alternatives was flawed in that the alternatives were not objectively presented in comparative form.

Agencies are required under the National Environmental Policy Act to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply

defining the issues and providing a clear basis for choice among options by the decisionmaker and the public" and to "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14. The "weighing of a project's benefits with its costs lies at the core of an agency's discretion." Webster, 685 F.3d at 430. Where an agency "provide[s] a reasonable explanation" for its approach in weighing alternatives "and . . . consistently applie[s] its approach to each alternative," the agency has satisfied its statutory obligation to compare alternatives. See Nat'l Audubon Soc'y, 991 F.3d at 585-86; Ohio Valley, 556 F.3d at 201 ("Agencies are entitled to select their own methodology as long as that methodology is reasonable, and we must defer to such agency choices.").

a)      Hurricane Clearance Time Evaluation

First, plaintiffs point to defendants' purportedly inconsistent reliance on hurricane evacuation time in favoring and disfavoring alternatives. They assert that the 2012 final environmental impact statement "obscure[s]" the relative hurricane evacuation benefit of each alternative by ostensibly nesting the preferred alternative, which lacks a third outbound lane on US 158, in a column with the more general MCB4 alternative, which includes that third outbound lane. (Pls.' Mem. (DE 89) at 42). However, review of table cited by plaintiffs reveals no such mischief. The table sets forth that the ER2 alternative would provide a clearance time of 22 hours in 2035 if it included the third outbound lane, (R. 34954), which it is described as having throughout the 2012 statement, (see, e.g., R. 34914). In contrast, the table explains that the MCB4 alternative would provide the same clearance time if it included a third outbound lane, but that the preferred alternative did not include such and would accordingly have a slower clearance time of 27 hours. (See R. 34954).

31

In the reevaluation by defendants, the updated hurricane clearance time modeling, relying on the update to the National Hurricane Center's warning timeframe which results in a new 30-hour goal, (R. 68832), still indicated a current higher-than-standard clearance time and an increase to that time in the future, that is, an ongoing need for reducing that time. (R. 68845-46). The ER2 alternative, on this new data, was predicted to provide the quickest hurricane clearance time in a constrained development scenario and an equally quick time as the Mid-Currituck Bridge in an unconstrained development scenario. (R. 68868). This is due, in part, to the ER2 alternative's inclusion of third outbound lane on US 158, which still offered the greatest reduction in hurricane evacuation clearance time. (R. 68849, 68867). However, the Mid-Currituck Bridge still provided a reduction in hurricane clearance time from a no-build alternative, and defendants concluded that the reduction in clearance time achieved by either the ER2 alternative or the preferred alternative was "substantial[]." (R. 68869; see also R.69490-91).

The record throughout evidences that defendants presented the alternatives in comparative form and devoted substantial treatment to each alternative considered in detail so that reviewers could evaluate their comparative merits.

b)      Funding and Financing Comparison

Second, plaintiffs contend that defendants unfairly skewed their comparison of the financial feasibility of the preferred alternative and the ER2 alternative to favor a Mid-Currituck Bridge option. An environmental impact statement and subsequent decision based thereon "may be deficient if [their] assessment of the costs and benefits of a proposed action rel[y] upon misleading economic assumptions." Webster, 685 F.3d at 430.

Defendants clearly stated in the 2012 final environmental impact statement and in the 2019 record of decision, and related reevaluation documents, that the ER2 alternative was consistently

the least expensive build alternative.  (See R. 34955-56, 68806).  However, defendants have persistently explained that the preferred alternative was financially feasible, unlike the ER2 alternative, because it had access to funding sources that the ER2 alternative did not.  Initially, in 2012, the preferred alternative was projected to rely on toll revenue (utilized in various forms), certain state appropriations, and a partnership with a private entity, all of which the ER2 alternative could not rely upon, causing a shortfall in funding for that alternative.  (R. 34957-58).  Even upon reevaluation, after the state appropriations were withdrawn and the private partnership abandoned, defendants explained that the preferred alternative remained financially feasible and the ER2 alternative did not, primarily, because toll revenues could not be used to acquire financing for the ER2 alternative.  (R. 68808).

Plaintiffs argue that defendants' reevaluation failed to consider the funding potentially available for the ER2 alternative under North Carolina's Strategic Transportation Investments scoring system implemented in 2013, and therefore unreasonably concluded that state funding would not be available.  In the 2019 plan of finance, the ER2 alternative was treated as if it would receive the exact same state funding that the preferred alternative would, that is, they would score similarly under state's revenue allocation system.  (See R. 68808).  Defendants explain that, if anything, this likely assumes more state funding than would be available to the ER2 alternative given that regionally and statewide it addresses the same transportation needs, as pertinent under the scoring system, and it had less local support, as would negatively impact its score.  (See R. 68973, 69269, 70168, 72863).  See generally N.C. Gen. Stat. § 136.189.11 (enumerating North Carolina's Transportation Investment Strategy Formula).

The factual dispute over the extent to which the ER2 alternative and the Mid-Currituck Bridge would receive funding under the state's Strategic Transportation Investment scoring system

is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." Marsh, 490 U.S. at 376-77 ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976))). Moreover, plaintiffs have not demonstrated why it was unreasonable of defendants to assume the two projects would score similarly. Cf. Nat'l Audubon Soc'y, 422 F.3d at 186 ("Courts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor.").

Plaintiffs also contend that defendants' financial feasibility analysis was unreasonable in that it ignored the impact that forecasted changes in traffic amount and sea level rise would have on toll revenue in the future.

Plaintiffs' contention that defendants failed to provide detailed calculations as to future toll-revenue over the next half-century in light of rising sea levels and changing traffic forecasts does not obviate defendant's reasonably discernable and rational path from the fact that one alternative generates revenue to the conclusion that it will likely be more easily financed. See Fox Television Stations, 556 U.S. at 513-14 ("[A] court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Moreover, the reevaluation documents explain that a later "independent traffic and revenue forecast" will "determine[e] the toll revenue a bridge could generate" and the adequacy of such "for bridge financing," (R. 68823), which may result in the project's termination if it is found to be financially infeasible based on toll revenue projections. (R. 69279). Plaintiffs have not shown how this constitutes such "distorted" economic assumptions "as to impair fair consideration." Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446 (4th Cir. 1996).

Additionally, plaintiffs argue that defendants failed to consider projected rising sea levels in the area, as expressed in their preferred technical reports, as it impacts future toll revenue. Both the 2012 final environmental impact statement and the later reevaluation documents consider and discuss future rising sea levels. (See R. 35047-49, 68930-31). On the studies used by defendants,[6] all of the considered alternatives, including the no-build alternative, would be impacted by rising sea levels over the next century with certain portions of the Outer Banks becoming inundated. (Id.). Defendants also concluded that the components of any the alternatives would likely be replaced before 2100 when the highest sea level rise was predicted. (R. 35048). The equal impact of this environmental phenomena, accordingly, does not serve as a differentiator among the alternatives.

c)      Selection of the Mid-Currituck Bridge

Although plaintiffs structure their challenge as a procedural one, specifically in reference to defendants' framing of the comparison of alternatives, they implicitly challenge the ultimate selection of the Mid-Currituck Bridge alternative as arbitrary and capricious given the changes in circumstances from 2012 to 2019. (See, e.g., Pls.' Mem (DE 89) at 22 ("The Agencies failed to take a hard look at new traffic forecasts that undermine the stated need for the Toll Bridge, place its financial viability in question, and demonstrate that other alternative solutions are more viable than previously thought.")). Plaintiffs point to a number of perceived errors in defendants' selection and analysis. However, the majority of these asserted errors constitute flyspecking or

---

[6]      To the extent plaintiffs attack defendants' use of a different, older set of updated sea level rise projections, plaintiffs have not shown that, with due deference to the agency's choice of methodology, the decision was so unreasonable to constitute arbitrary or capricious decisionmaking. See Marsh, 490 U.S. at 378 ("[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); Ohio Valley, 556 F.3d at 201 ("[C]onsideration of extra-record evidence in a [National Environmental Policy Act] case does not, however, give courts license to simply substitute the judgment of plaintiff's experts for that of the agency's experts. Agencies are entitled to select their own methodology as long as that methodology is reasonable, and we must defer to such agency choices.").

would otherwise improperly invade areas of expertise well within defendants' discretion.  See generally Webster, 685 F.3d at 422, 430; North Carolina, 957 F.2d at 1135 ("An agency has substantial discretion in its evaluation of alternatives.").

Defendants' record of decision and incorporated documents draw a rational connection from the updated facts found and their reaffirmed conclusion as to the Mid-Currituck Bridge. Defendants explained that although traffic congestion was now predicted to be less severe in 2040 than had been previously predicted for 2035, traffic congestion was still considered a problem currently and would continue to worsen.  (R. 68838-68839).  The Mid-Currituck Bridge, in the form described in the reevaluation study report, provided a better, predicted reduction in a number of traffic congestion metrics, under a constrained or unconstrained development scenario, than the other alternatives.  (See, e.g., R. 68850-51, 68865-67).   While the ER2 alternative also provided traffic flow benefits, it "would not address congestion on NC 12" and would worsen it in some instances.  (R. 688867).

Similarly, although a lower future travel time for a certain representative trip in the project area was predicted for 2040 than had previously been predicted for 2035, the travel time, especially during the summer, was still high enough to merit address by a project.  The updated travel time studies and traffic forecasts still indicated that a Mid-Currituck Bridge would offer greater benefits in some areas that the ER2 alternative.  (R. 68850-51, 68867).  As noted above, defendants disclosed that the ER2 alternative had the greatest hurricane evacuation clearance time reduction, but also that the Mid-Currituck Bridge would provide a meaningful reduction.  (R. 68869; see also R. 69490-91).

As to the impacts of each alternative, the reevaluation documents and record of decision highlighted that, among other differences, the ER2 alternative would have a higher wetland fill

impact and would result in a higher number of acres of impervious surface as would impact water quality. (R. 69460, 69499). Further, the record of decision highlighted the previously discussed concerns with funding the ER2 alternative as compared to the Mid-Currituck Bridge, and its toll revenue, as impacting the selection of the Mid-Currituck Bridge. (R. 69460-61).

Given the "considerable discretion" agencies enjoy "in defining the purposes and needs for their proposed actions," and that the purported purposes were reasonable, review of the record reveals a rational link between the facts defendants found regarding the purpose and need for the project and their ultimate conclusion on the continuing need for the project. See Webster, 685 F.3d at 422. Further, again, acknowledging that "weighing of a project's benefits with its costs lies at the core of an agency's discretion," defendants' choice of the Mid-Currituck Bridge as the selected alternative has a rational connection to the facts found and described in the administrative record. Id. at 430. Defendants weighed the alternatives' benefits and costs, concluding that the preferred alternative as revised best met the needs and purposes of the project while having an acceptable impact on the relevant communities, cultural resources, and natural resources and being financially feasible. (See R. 68838-47, 69454, 69458-61). The financing of each alternative was only one factor considered in selecting the Mid-Currituck Bridge. (See R. 69458-61). Plaintiffs have not demonstrated why reliance on these other independent, adequate reasons identified by defendants for selecting the Mid-Currituck Bridge would make that selection an arbitrary or capricious one.

In sum, defendant-transportation agencies have made "complex predictions within [their] area of special expertise," Ohio Valley, 556 F.3d at 192, and "provide[d] an explanation of [their] decision that includes a rational connection between the facts found and the choice made." Nat'l Audubon Soc'y, 991 F.3d at 583; see also Strycker's Bay, 444 U.S. at 227-28. Defendants did not

37

"entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation for [their] decision that runs counter to the evidence before the[m]." Defs. of Wildlife, 762 F.3d at 396. As detailed extensively above, "the agency . . . examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made,'" Ohio Valley, 556 F.3d at 192 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983)), meaning defendants' "decision should be sustained." Nat'l Audubon Soc'y, 991 F.3d at 583.

The court's review goes no further. See, e.g., Suffolk County v. Sec'y of Interior, 562 F.2d 1368, 1383 (2d Cir. 1977) ("The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the [environmental impact statement]."). Rather, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97-98 (1983).

While plaintiffs suggest the Mid-Currituck Bridge is not needed or unwise, it is not for the court to "make the ultimate decision but only to see that the official or agency take[s] a 'hard look' at all relevant factors." Coal. for Responsible Reg'l Dev. v. Coleman, 555 F.2d 398, 400 (4th Cir. 1977); see also id. (explaining that the court's role is to "determine whether the agency, in its conclusions, made a good faith judgment, after considering all relevant factors, including possible alternative or mitigative measures"); Nat'l Audubon Soc'y, 422 F.3d at 199 ("Whether the Navy needs a new [Outlying Landing Field] is irrelevant to NEPA compliance because NEPA does not demand particular results."). The court concludes that defendants have done so in their final environmental impact statement and record of decision.

c. Failure to Supplement the 2012 Environmental Impact Statement

Finally, plaintiffs challenge defendants' failure to issue a supplementary environmental impact statement after the 2012 one, prior to entry of the 2019 record of decision.

The regulations promulgated under the National Environmental Policy Act require agencies to "prepare supplements to . . . final environmental impact statements if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). Defendant Highway Administration's own regulations similarly provide that an environmental impact statement "must be supplemented whenever the Administration determines that . . . [n]ew information or circumstances relevant to environmental concerns . . . would result in significant environmental impacts not evaluated in the" environmental impact statement. 23 C.F.R. § 771.130(a). However, "a supplemental environmental impact statement will not be necessary where . . . [the] new information, or new circumstances result in a lessening of adverse environmental impacts evaluated in the [environmental impact statement] without causing other environmental impacts that are significant and were not evaluated in the [environmental impact statement]." Id. § 771.130(b)(1); see also Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs, 941 F.3d 1288, 1305 (11th Cir. 2019) ("The changes resulted in less extensive environmental impacts than originally envisioned. An agency is generally not required to conduct a new environmental analysis when changes result in less harmful environmental effects than originally anticipated."); Friends of the Bow v. Thompson, 124 F.3d 1210, 1218 (10th Cir. 1997) ("[T]he 55% reduction in sale volume did not constitute a substantial change in the action relevant to environmental concerns. We note that this change would result in a reduction in environmental impact rather than an increase in environmental impact . . . [and] believe that a reduction in environmental impact is

39

less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact.").

"To effect this continuing duty of examination," <u>Jersey Heights Neighborhood Ass'n v. Glendening</u>, 174 F.3d 180, 190 (4th Cir. 1999), defendant Highway Administration's regulations require that the agency "must prepare a written evaluation of the final [environmental impact statement] . . . if major steps to advance the action . . . have not occurred within three years after the approval of the final [environmental impact statement]." 23 C.F.R. § 771.129(d). If a supplement to the environmental impact statement is required, the agency "[s]hall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement." 40 C.F.R. § 1502.9(c)(4).

This is in line with the Supreme Court's interpretation of the statutory regime. The Court has held that a supplemental environmental impact statement is required only "[i]f there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." <u>Marsh</u>, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)). Case law requires that "the new circumstance . . . present a <u>seriously</u> different picture of the environmental impact of the proposed project from what was previously envisioned." <u>Hughes</u>, 81 F.3d at 443. Accordingly, "[n]ot every new circumstance requires a supplemental [environmental impact statement]." <u>Hickory Neighborhood</u>, 893 F.2d at 63.

The court "review[s] an agency's decision to prepare [a supplemental environmental impact statement] in two steps." <u>Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.</u>, 914 F.3d 213, 222 (4th Cir. 2019). First, the court "determine[s] whether the agency took a hard look at the proffered new information." <u>Id.</u> "If the agency concludes after a preliminary inquiry that the

environmental effect of the change is clearly insignificant, its decision not to prepare [a supplemental environmental impact statement] satisfies the hard look requirement." Id. At the second step, the court "review[s] whether the agency's decision not to prepare a [supplemental environmental impact statement] after taking a hard look was arbitrary or capricious." Id.

For example, in Hodges v. Abraham, 300 F.3d 432 (4th Cir. 2002), the United States Court of Appeals for the Fourth Circuit considered the United States Department of Energy's National Environmental Policy Act adherence in approving the transfer of surplus plutonium. Id. at 436-47. The agency had issued an environmental impact statement in 1996 and announced its record of decision in 2002. Id. at 439-40. The court concluded that the agency had taken the requisite "hard look" at the environmental consequences of its change in plans when it explicitly evaluated those consequences and determined that they were "not significantly different" from those discussed in a prior environmental impact statement. Id. at 447; accord Save Our Sound, 914 F.3d 233 ("Because the Agencies went into detail in their comparison between the Jug-Handle Bridge and previous versions of the bridge, their coverage satisfies the hard look requirement.").

Plaintiffs identify four categories of new information that they contend presents a seriously different picture of the circumstances of the proposed project from what was previously envisioned: changes in traffic forecast for the area, updated growth and development projections for the area, updated sea level rise predictions, and renewed feasibility of the ER2 alternative with revisions proposed by plaintiffs.

However, as a preliminary matter, none of plaintiffs' asserted bases of new information relate to "environmental concerns" as caused by the proposed action. See 40 C.F.R. § 1502.9(c)(ii); Save Our Sound, 914 F.3d at 221-22 ("To merit a[] [supplemental environmental impact statement], the changes must present a seriously different picture of the environmental

impact of the proposed project." (emphasis added)); Jersey Heights Neighborhood Ass'n, 174 F.3d at 190 ("If a new circumstance presents a seriously different picture of the environmental impact of the proposed project from what was previously envisioned, the [final environmental impact statement] must be supplemented."). Plaintiffs' argument regarding a supplemental environmental impact statement focuses primarily on how these changes impact the need and feasibility of the project, addressed above, rather than changes in how the project impacts the environment. (See, e.g., Pl.'s Mem. (DE 89) at 28 ("Significant new information . . . [has] emerged that call[s] into question the need for the project, the validity of the analysis of impacts and alternatives, and the relative utility and financial feasibility of the Toll Bridge.")). Moreover, defendants, in fact, did take a hard look at this new information, and their decision to not prepare a supplemental environmental impact statement in light of this hard look was neither arbitrary nor capricious, for the following reasons.

i.    New Traffic Forecasts

First, plaintiffs assert that changes in the traffic forecasts for the project area merit a supplemental environmental impact statement because they predict lower average daily traffic than previously projected.

The reevaluation documents specifically acknowledge and discuss that traffic forecasts for the area have changed. They enumerate that "the project area is experiencing slower growth rates both in terms of development and traffic than was assumed in the previous forecasts." (R. 68822). For example, the updated forecast for 2040 predicts that the putative Mid-Currituck Bridge would have an average annual daily traffic amount of 7,700 vehicles rather than the previously predicted 12,600, and that the Wright Memorial Bridge would have an average annual daily traffic amount of 23,100 vehicles rather than the previously predicted 37,400. (R. 68826). Further, the predicted

summer weekday traffic (measured in terms of number of vehicles per day) for each bridge had fallen from 14,500 and 46,000 to 8,600 and 26,000 for the Mid-Currituck Bridge and the Wright Memorial Bridge, respectively. (Id.).

The reevaluation study report surveyed the impact that this had on the project's purpose, needs, benefits, the feasibility of other alternatives, and, most pertinent, the project's environmental consequences. (R. 688838-69, 688869-82, 68884-919). Defendants ultimately concluded that the changes caused in the impacts of either the ER2 alternative or the preferred alternative were not considered significant. And plaintiffs do not argue that defendants failed to assess how the new traffic forecasts would change the environmental impacts of the project. (See, e.g., Pls.' Mem. (DE 89) at 30-31 ("The Agencies did not take the requisite hard look at new traffic forecasts or assess how the forecasts would change the viability of different alternatives")).

Accordingly, because defendants "conclude[d] after a preliminary inquiry that the environmental effect of the change is clearly insignificant, [their] decision not to prepare a[] [supplemental environmental impact statement] satisfies the hard look requirement." Save Our Sound, 914 F.3d at 222. Defendants "explicitly evaluated [the new environmental] consequences and determined that they were not significantly different from those discussed in a prior EIS," meaning they have satisfied step one of the inquiry. Id.

The court thus turns to the question of "whether the agency's decision not to prepare an [supplemental environmental impact statement] after taking a hard look was arbitrary or capricious," id., that is, whether defendants' "explanation of [their] decision . . . includes a rational connection between the facts found and the choice made." Nat'l Audubon Soc'y, 991 F.3d at 583.

Here, defendants' reevaluation documents rationally draw a logical nexus between the changes in the traffic forecast and the conclusion that those changes did not paint a seriously

different picture of the environmental impact the project would have. (See, e.g., R. 68921-22 (considering the impact of the updated traffic forecasts on traffic noise impacts), 68929 (considering the impact on energy used to construct, operate, and maintain the project or its alternatives); see also R. 69498-502 (summarizing the changes in key impacts between the final environmental impact statement and the reevaluation)). A conclusion, again, that plaintiffs do not challenge in their briefing. (See Pls.' Mem. (DE 89) at 22-25; Pls.' Resp. & Reply (DE 95) at 7-11). Nor does the court find any cause in the record to surmise that defendants' conclusion that the predicted decrease in traffic would not cause adverse environmental consequences not anticipated in the final environmental impact statement was an arbitrary of capricious one.

Instead, plaintiffs attack defendants' failure to supplement the 2012 environmental impact statement because, in their view, the new traffic forecasts changed the financial feasibility of a Mid-Currituck Bridge and the need for such a bridge. (See Pls.' Mem (DE 89) at 22 ("The Agencies failed to take a hard look at new traffic forecasts that undermine the stated need for the Toll Bridge, place its financial viability in question, and demonstrate that other alternative solutions are more viable than previously thought.")). Although the Fourth Circuit has not closely examined this issue, the court concludes that neither is a type of information requiring supplementation of a final environmental impact statement under the Council on Environmental Quality's regulations or the Supreme Court's jurisprudence. See Environmental Impact and Related Procedures, 52 Fed. Reg. 32,646, 32,656 (Aug. 28, 1987) ("[N]ew information . . . may be very important or interesting, and thus, significant in one context, . . . and yet should not be considered 'significant' so as to trigger preparation of a supplemental [environmental impact statement] because the information does not result in a significant change in the anticipated environmental impacts of the proposed action."); Marsh, 490 U.S. at 373-74 ("[A]n agency need

not supplement an [environmental impact statement] every time new information comes to light after the [environmental impact statement] is finalized.").  Any changes to the financial feasibility and the need for the Mid-Currituck Bridge, as described by plaintiffs, are not changes in the environmental impacts of the bridge-project.  See Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520, 548 (8th Cir. 2003) ("A supplemental DEIS is required only when changes are substantial, and even then, only if the substantial change is relevant to environmental concerns." (emphasis added)); see, e.g., Ctr. for Biological Diversity, 941 F.3d at 1304 (explaining that a change in ownership of a permit-controlled polluting source was "of no significance to the environmental impacts of the project" and, therefore, did not warrant a supplemental environmental impact statement); Trenton Residents Against 29 v. FHWA, 176 F.3d 658, 667 (3d Cir. 1999) (explaining that "changed safety conditions" of a project, after a final environmental impact statement, "alone, do not trigger the need for a [s]upplemental [e]nvironmental [e]mpact [s]tatement").

Plaintiffs rely on the United States Court of Appeals for the Ninth Circuit's decision in Alaska Wilderness Recreation and Tourism Association v. Morrison, 67 F.3d 723 (9th Cir. 1995), to argue otherwise.  There, the Ninth Circuit required the Forest Service to supplement a prior environmental impact statement where the long term-contract upon which the agency's chosen alternative depended had been canceled subsequent to the final environmental impact statement. Id. at 730.  Plaintiffs cite this case for the proposition that a change in the preferred alternative's financially viability and the attractiveness of alternatives "'is an event requiring serious and detailed evaluation' by the agencies in a supplemental [environmental impact statement]" and for the proposition that "[w]hen changes in baseline conditions remove barriers that were once in place and used to eliminate alternatives, an agency must undertake a 'serious and detailed evaluation'

45

and prepare a[] [s]upplemental [environmental impact statement] to assess whether those changes merit selecting a different path." (Pls.' Mem. (DE 89) at 30-31 (quoting Alaska Wilderness, 67 F.3d at 730)).

Even assuming that Alaska Wilderness's rationale on non-environmental impacts applies here, the court finds the case distinguishable, as the United States Court of Appeals for the D.C. Circuit did in Friends of Capital Crescent Trail v. Federal Transit Administration, 877 F.3d 1051 (D.C. Cir. 2017). As the Friends court explained, "Alaska Wilderness involved a basic change that undercut the rationale upon which the agency action depended." 877 F.3d at 1061. The Friends court contrasted that with the situation before it in which "even with reduced [system-wide] ridership," a proposed light rail line still met one of its transport-related purposes "as well as or better than the other alternatives," and still met its other unrelated purposes. See id; see also id. at 1060 (rejecting plaintiff's argument that "even if . . . Metrorail ridership and safety information did not reveal an environmental impact of a kind not previously addressed in the [final environmental impact statement], it was surely 'relevant' to the [project's] environmental impact and 'bear[s] on the proposed action' because it makes the bus rapid transit and other alternatives more attractive." (final alteration in original)).

Here, as in Friends, defendants explained that the decrease in projected traffic did not prevent the preferred version of the Mid-Currituck Bridge from still meeting its traffic congestion, travel time, and hurricane clearance time purposes. (R. 68847-69). Defendants have broad discretion in defining the purposes of and need for the project, see Webster, 685 F.3d at 422, and the factual dispute over the benefits of project are an "example of a . . . dispute the resolution of which implicates substantial agency expertise." Marsh, 490 U.S. at 376. The changes in traffic forecasts did not require a supplemented final environmental impact statement.

ii.     Updated Growth and Development Projections

Next, plaintiffs point to updates in growth projections in the project area that indicate slowed development as new information meriting a supplemental environmental impact statement.

Defendants analyzed this information thoroughly in their reevaluation documents. (See, e.g., R. 68825 (discussing slowing permanent population growth in Dare and Currituck County and that growth in tourism has slowed but continues), 68827 (discussing that "current growth trends indicate that the permanent and tourist population will grow at a slower rate than was expected when the previous traffic forecasts were prepared")). This information was, in fact, used to develop the updated traffic forecast as relied upon by defendants. (See R. 68824; see also R. 44647, 44653). While defendants did not discuss at length the environmental impacts that such changes in development would have, (see, e.g., 68953), they were factored into the updated traffic forecast, which, as noted above, defendants concluded did not reveal significant environmental impacts caused by the project not evaluated in the final environmental impact statement. Defendants took the requisite hard look at the change in development trends in the project area.

Moreover, plaintiffs, again, fail to explain how this information constitutes new information showing that remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered in the final environmental impact statement. Instead, plaintiffs assert the change in development "call into question whether the Toll Bridge is necessary and the best alternative." (Pls.' Mem. (DE 89) at 31). That is a distinct question from whether that information present a seriously different picture of the environmental impact of the proposed project, which it does not. Defendants' decision to not supplement the final environmental impact statement on the basis of this category of information was not arbitrary of capricious.

47

iii.     Updated Sea Level Rise

The next class of novel information that plaintiffs argue merited a supplemental environmental impact statement is "readily available new sea level rise data." (Pls.' Mem. (DE 89) at 32).

The 2012 final environmental impact statement considered how predicted sea level rise impacted the project, (see, e.g., R. 35047-49), as did the reevaluation documents, (see, e.g., R. 68930). In both cases, defendants explained that while the project area and existing transportation infrastructure would be impacted by sea level rise and related storm surge, the Mid-Currituck Bridge "would be a useful asset in reducing the impact of sea level rise on the project area's road system," in part," because it would allow a way off of the Currituck County portion of the Outer Banks if and when the Dare/Currituck County line portion of the barrier island is inundated." (R. 68930). Neither set of documents discussed the rising sea levels as an environmental impact caused by the project, presumably because such a causal impact was not "reasonably foreseeable." 40 C.F.R. § 1508.8(b).

However, plaintiffs do not fault defendants for their analysis regarding the project's impact on sea levels. Nor do they assert that new information on rising sea levels implicated new environmental impacts caused by project that had not been previously considered. Rather, they contend that the updated sea level rise forecasts reveal the rising sea level's increased impact on the project's viability over the next half-century. Again, this is not a new circumstance that presents a seriously different picture of the environmental impact of the proposed project from what was previously envisioned. The National Environmental Policy Act is "a purely procedural statute" and, in and of itself, does not "prohibit[] . . . unwise[] agency action." Webster, 685 F.3d at 418. Therefore, while plaintiffs may contend that the updated forecasts on the rising sea level

48

undermines the viability of a Mid-Currituck Bridge, the National Environmental Policy Act's procedural requirement, by regulation, regarding supplements to environmental impact statements is not implicated.

Plaintiffs rely on the United States Court of Appeals for the Fifth Circuit's opinion in Louisiana Wildlife Federation, Inc. v. York, 761 F.2d 1044 (5th Cir. 1985) (per curiam), to argue that "a significant change to the assumption of baseline conditions [is] 'sufficient to require an agency to supplement an original [environmental impact statement].'" (Pls.' Mem. (DE 89) at 34 (quoting La. Wildlife Fed'n, 761 F.2d at 1051)). However, Louisiana Wildlife Federation recognized that the decision "whether to supplement an existing [environmental impact statement] because of new information" is controlled by "the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original [environmental impact statement]." 761 F.2d at 1051.

In that case, the plaintiffs "raised a substantial environmental issue" in that the agency had assumed that a significant portion of the forested areas within the project area would be cleared regardless of the project, but later information raised a "reasonable possibility that a significant number of these acres will not be cleared except for the Project," that is, "significant additional impacts" on the environment caused by the project "not considered in the [final environmental impact statement]." See id. As already noted, this is not the case here nor does plaintiff argue that it is, making Louisiana Wildlife Federation inapposite.

      iv.    Improved ER2 Alternative and Emerging Vacation Trends

Finally, plaintiffs maintain that "significant new information about viable alternatives including an improved variant on the Existing Roads alternative that was submitted by" plaintiffs

and "changing vacation patterns[']" impact on the viability of shifting rental times alternative merited a supplemental environmental impact statement. (Pls.' Mem. (DE 89) at 35).

Defendants considered how the "updated traffic forecasts" affected the previous decisions on which study alternatives would receive detailed study. (R. 68869-82). They concluded that even with those changes that the analysis of which alternatives were reasonable remained the same, including the conclusion that shifting rental times was not feasible due to defendants' inability to compel its implementation by private property owners. (R. 68871). Defendants also considered a revised version of the ER2 alternative from what had been considered in the 2012 final environmental impact statement, (R. 68830), albeit not the one proffered by plaintiffs. (See R. 68882, 69295-99).

Plaintiffs provide no authority for the contention that their specifically proffered version of an alternative must be considered. And the revisions considered regarding the ER2 alternative do not warrant a supplement to the final environmental impact statement. Cf. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18035 (Mar. 17, 1981) (explaining that if a variation of an alternative discussed in an environmental impact statement is proposed that is "qualitatively within the spectrum of alternatives that were discussed in the draft" and is a "minor variation," "a supplemental draft will not be needed").

As to plaintiffs' assertion that changing trends in vacation habits, such as the services offered by companies like "Airbnb" and "VRBO," evidenced in extra-record documents warrant reconsideration of the shifting rental times alternative in a supplemental final environmental impact statement, (Pls.' Mem. (DE 89) at 37), defendants did not violate the National Environmental Policy Act's strictures. The Fourth Circuit has recognized that it is "not arbitrary

50

or capricious for [defendant-agencies] to decline to reconsider . . . alternatives in a[] [supplemental environmental impact statement] when the new information proffered by [plaintiffs] d[oes] not implicate all of [defendant-agencies'] independently adequate reasons for initially rejecting" the alternative. Save Our Sound, 914 F.3d at 223-24. Here, even accepting plaintiffs' assertion of changing rental and vacation behaviors, those changes do not change defendants' independently adequate reason of a lack of power to compel implementation of the alternative for rejecting the shifting rental times alternative. See also Friends, 877 F.3d at 1063 ("Agencies need not reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment.").

In sum, the new circumstances proffered by plaintiffs were considered by defendants when necessary and analyzed in the matter required by the National Environmental Policy Act, namely, whether the changes presented a seriously different picture of the environmental impact of the proposed project from what was previously envisioned.

The court is mindful of the Supreme Court's guidance that if litigants could demand a halt of administrative processes through preparation of a supplemental environmental impact statement "as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." Vt. Yankee, 435 U.S. at 555. Although time has plainly passed between the 2012 final environmental impact statement and consummation of the process in the 2019 record of decision, this gap alone does not warrant a supplement. See, e.g., Coker v. Skidmore, 941 F.2d 1306, 1310 (5th Cir. 1991) (explaining that there was no need to supplement an environmental impact statement simply because "portions of

it become out-of-date"); <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 701 F.2d 1011, 1036 (2nd Cir. 1983) ("[M]ere passage of time rarely warrants an order to update the information to be considered by the agency."). And, as fulsomely detailed above, the proffered changes in circumstances do not indicate that the proposed agency action will affect the quality of the human environment in a significant manner or to a significant extent not already considered. Therefore, plaintiffs' challenge to defendants' failure to supplement the 2012 final environmental impact statement fails as a matter of law.

## CONCLUSION

Based on the foregoing, defendants' motions for summary judgment (DE 90, 92) are GRANTED. Plaintiffs' motion for summary judgment (88) is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 13th day of December, 2021.

LOUISE W. FLANAGAN
United States District Judge